UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TOBE LAWRENCE, JR. | CIVIL ACTION |
| VERSUS | NO. 24-2734 |
| TIM HOOPER, ET AL. | SECTION "G" (2) |

## REPORT AND RECOMMENDATION

Petitioner Tobe Lawrence Jr. filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 4) which was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.   Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.[1]   For the following reasons, I recommend that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE** as time barred.

## I.    FACTUAL BACKGROUND

Lawrence is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]   On February 14, 2019, Lawrence was indicted by a Jefferson Parish grand jury on

---

[1] A district court may hold an evidentiary hearing only when the petitioner shows either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence (*id*. § 2254(e)(2)(A)(ii)) *and* the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.   *Id*. § 2254(e)(2)(B).

[2] ECF No. 4 at 1.

one count of first-degree rape where the victim is under 13 years of age.[3] Lawrence pleaded not

guilty.[4]

The Louisiana Fifth Circuit Court of Appeal summarized the facts established at trial as

follows in relevant part:

> In July of 2018, K.A., who was 22 years old at the time, reported to the
> Kenner Police Department that she had been sexually abused as a juvenile by
> defendant, Tobe Lawrence, who was the ex-boyfriend of her grandmother, Monica
> Collar. At trial, Detective Peter Foltz testified that he was assigned to conduct a
> follow-up investigation and met with K.A. who gave an audio-recorded statement.
> In her statement, K.A. described four incidents of sexual abuse by defendant.

> According to Detective Foltz, K.A. stated that the first incident occurred
> when she was four or five years old and had come home from school. K.A. lived
> with her grandmother, defendant, and others at the time. She recalled that defendant
> joined her on the sofa to watch television, and she was looking for a remote when
> she "found" defendant's penis in her hand. Defendant told her it was something she
> had to learn how to use later. K.A. told the detective that defendant began fondling
> her vagina and had her perform oral sex on him.

> Detective Foltz testified that K.A. told him about a second incident when
> defendant called her into a room at her grandmother's house when she was six or
> seven years old. Defendant placed K.A. on his lap facing towards him and gave her
> instructions. Defendant then grabbed her around the waist and "began running her
> vaginal area against his penile area." K.A. told the detective that defendant inserted
> his finger into her vagina, which caused her to scream. She stated that her cousin,
> T.C., came in the room, but defendant told him to leave. K.A. informed Detective
> Foltz that she was then forced to perform oral sex on defendant.

> Detective Foltz testified about a third incident described by K.A. that
> occurred when she was approximately seven years old. K.A. told him that she and
> T.C. were sleeping on a pallet when defendant woke her up. She stated that
> defendant began performing oral sex on her. The detective testified that K.A. said
> defendant placed her on top of his penile area and neither of them had on underwear,
> so her vaginal area rubbed against his groin. K.A. stated that she believes defendant
> stopped when he heard her aunt arrive home. Detective Foltz testified that K.A.

---

[3] The state court record was electronically filed by the State at ECF No. 14. ECF No. 14-1 at 73, Bill of Indictment,
2/14/19. Although this Bill of Indictment now reflects the 6/1/21 handwritten amendment by the District Attorney
changing the word "thirteen" to "twelve," the typed portion reflects the original indictment.

[4] *Id*. at 79, Min. Entry, 2/21/19.

said she followed T.C. into a bathroom that same day and "tried to hump" him and attempted to perform oral sex on him. T.C.'s mother, T., walked in and made them stop. Detective Foltz testified that he also questioned T.C. about this incident, and T.C. advised that they touched each other's private parts that day. However, T.C. was not able to provide any further information.

The detective stated that K.A. recalled a fourth incident when she was in second or third grade and approximately nine years old. K.A. told Detective Foltz that she and defendant were lying on a bed together, and he began fondling her vagina and digitally penetrated her. K.A. recalled that defendant then inserted his penis into her vagina. She cried from the pain, so defendant stopped. She continued to cry, so defendant told her to tell her grandmother that she "caught a whooping." The detective recalled that K.A. said her grandmother gave her Pepto-Bismol later that night after she complained that her stomach hurt. Detective Foltz provided that K.A. indicated there were ten or more incidents when she was sexually assaulted by defendant.

Detective Foltz testified that he later spoke with K.A.'s aunt, L.C., because Ms. Collor advised him that L.C. said defendant also sexually abused her. According to Detective Foltz, L.C. stated that she was around ten years old when defendant started to sexually abuse her. L.C. told the detective about three specific incidents. The first incident occurred when L.C. was working out at home, and defendant approached her and began massaging her. During the massage, he touched her chest area under her shirt. L.C. described a second incident to Detective Foltz when she and defendant were lying in a bed together. Defendant "began touching her on the chest area and then at which time he got on top of her in a mounting position and began to dry-hump her." L.C. pushed defendant to the side, and then he began touching her chest and vaginal area under her clothes. L.C. recalled a third incident when she was a juvenile and was in a vehicle with defendant. L.C. told the detective that defendant placed her on his lap, "acting like she was driving," and began touching her vaginal area.

Based on the information he received, Detective Foltz obtained two arrests warrants—one based on K.A.'s allegations and the other on L.C.'s allegations.

K.A.'s trial testimony was consistent with the information she provided to Detective Foltz. K.A. testified that defendant was "a grandfather" in her family. K.A. indicated that she had lived at defendant's house on Albany Street, and could clearly recall several sexually inappropriate incidents involving defendant. She testified that the first incident occurred when she was four or five years old and had been dropped off at home after kindergarten. K.A. recalled that she and defendant were sitting on the sofa watching television when she reached for the remote and "ended up feeling" defendant's penis. She asked defendant what it was, and he told

3

her she would have to use it one day. Defendant then explained what to do, and she performed oral sex on him.

K.A. testified about a second incident at her grandmother's house on Albany Street, which was "up the street" from defendant's house on Albany where the first incident occurred, when she was in first or second grade. She recalled that she was in a room with her cousin, T.C., and a friend, when defendant called her into another room. She stated that defendant placed her on top of him and was moving her hips back and forth towards his hips. K.A. testified that defendant then flipped her over and "that was the first time he asked to insert his fingers." K.A. screamed, and T.C. came into the room. Defendant told him to go back. T.C. thought she was "getting a whooping," and K.A. said she thought it was "a whooping" at the time. K.A. testified that defendant told her not to tell anyone, that she was his princess, and called her "Tweety Bird."

K.A. testified about a third incident that occurred on Albany Street at the same house as the first incident. She stated that she and T.C. were lying on a pallet when defendant laid by her and performed oral sex on her. K.A. believed defendant stopped when he heard her aunt's car. Sometime later that day, K.A. went to the bathroom where T.C. was and started to do the same actions with T.C. that she had done with defendant. K.A. stated that her aunt came in and noticed they were "humping" and that she was about to perform oral sex on T.C., so she and T.C. "caught a whooping." K.A. later asked defendant why T.C. did not like it since defendant did, and he told her not to do it with anyone else.

K.A. testified about a fourth incident that occurred at a house on Gadsden Street, where they lived at the time, while her grandmother was at the store. K.A. was watching television when defendant came in the room, kissed her, took off both of their bottoms, and "actually inserted his self [sic] inside of" her. K.A. recalled that it was the first time he had done this and it hurt, so she screamed and started crying. K.A. testified that defendant stopped. When her grandmother came home, K.A. was still crying, so defendant said K.A. "caught a whooping because she was jumping from the sofa to the table or from the table to the sofa." K.A. recalled that her stomach was hurting that night, so her grandmother gave her Pepto-Bismol and she drank the entire bottle. K.A. testified that this incident occurred when she was about in the third grade and was about nine years old. She stated that this fourth incident was different than the others because previously, defendant would go slow and try to get her comfortable, but he did not ease her into it this time. K.A. explained that she remembered these four incidents vividly, but there were over ten times that he told her to perform oral sex, fondled her vagina, or "did other things of that nature."

K.A. testified that when she was a child, she did not tell anyone about the abuse. She later opened up to her ex-girlfriend, Amber Davis, who was the first

person she told about the abuse. K.A. recalled that after she told Ms. Davis about the abuse, there was a Father's Day event in 2018 when defendant came to her father's house. K.A. testified that defendant was making eye contact with her, and Ms. Davis asked her what was wrong and if "that's him." When K.A. said yes, Ms. Davis told her to say something or she would tell K.A.'s dad.

Amber Davis testified that K.A. is her ex-girlfriend. She indicated that while they were dating, K.A. told her that she used to go to her "uncle's house," and he would sexually abuse her. She stated that K.A. told her "it started from oral to penetration." Ms. Davis said K.A. did not tell her the person's name and only said "it was somebody that she was related to." Ms. Davis recalled attending a barbecue around Father's Day in June of 2018. She stated she was in the pool with K.A. and others when K.A.'s mood changed as her father walked up with her "uncle." Ms. Davis asked if she was okay, and K.A. replied, "that's the person who did it to me." Ms. Davis testified that she asked K.A. why she did not say anything, and K.A. replied that she did not know how her dad would react.

L.C. testified that defendant was her stepfather, and K.A. is her niece. She indicated that defendant started sexually abusing her when she was about ten years old. She remembered an incident when she was sore from playing sports, and defendant massaged her but also touched her breasts. L.C. also recalled an incident when she was lying in bed with defendant "and it went from touching to dry humping." She further testified about an incident when she was still a child and defendant was teaching her how to drive. Defendant sat her on his lap and touched her chest area and legs. L.C. testified that she eventually told her sister what happened to her because something similar happened to K.A.

Monica Collor, K.A.'s grandmother, testified that she met defendant over twenty years ago and was his girlfriend, but they broke up in 2006. She stated that defendant and several others lived with her on Albany Street and Gadsden Street. Defendant would sometimes watch the children when she was not home. Ms. Collor remembered an incident when she came home, and K.A. was crying. Ms. Collor asked defendant why K.A. was crying, and he said she was being disrespectful so he "whooped her." She testified that she never knew K.A. to be disrespectful to an adult. She recalled that K.A. was in kindergarten or first grade at that time. Ms. Collor also stated that she had previously heard defendant make inappropriate comments about younger females.

At trial, T.C. testified that K.A., his cousin, was two or three years older than him. He stated that they lived together growing up and were raised by their grandmother. He recalled an occasion when he heard K.A. scream and went to check on her. He stated that he went to defendant's room and defendant told him to leave, but he did not see anyone else. T.C. also recalled him and K.A. "touching

each other" in a bathroom and his "aunt" walking in. He stated that he recalled the event because they "got a whooping for it."

A.A. testified that K.A., his daughter, was four or five years old when he separated from K.A.'s grandmother, and K.A. then lived with her mom, her grandmother, and defendant. A.A. recalled a Father's Day event in 2018 when defendant came to pick him up and went to see the girls in the pool, including K.A. A.A. testified that K.A. called him a few weeks later and said she wanted to talk. After A.A. spoke with K.A., he spoke to defendant about what K.A. told him, and he denied the allegations. A.A. testified that he and others had previously heard defendant and another man make comments that they would "like to mess with young girls and young women, stuff like that – teenagers." He specifically recalled that defendant said "[t]hey had sex with a little teenager. She was like seventeen, eighteen, you know, sixteen years old."

Dr. Neha Mehta, an expert in child abuse pediatrics, testified that it is common for a child victim to delay disclosing abuse and that the vast majority of children do not tell in a timely manner. Dr. Mehta acknowledged that a familial relationship between the abuser and the victim can affect whether the abuse is reported and the timeliness of the disclosure. She testified that a younger victim may re-enact the sexual behavior they experienced.[5]

The state trial court set a jury trial for June 1, 2021.[6]  Prior to the start of trial, the District Attorney amended the bill of indictment to change the date of offense range and the victim's age from under thirteen to under twelve.[7]

Lawrence was tried before a jury on June 1 through 3, 2021.[8]  The jury found him guilty as charged.[9] No post-trial motions were filed. On June 30, 2021, the state trial court sentenced Lawrence to life imprisonment without benefit of parole, probation, or suspension of sentence.[10]

---

[5] *State v. Lawrence*, 362 So. 3d 807, 811-815, No. 21-KA-733, (La. App. 5th Cir. Nov. 2, 2022); ECF No. 14 at 338-345, 5th Cir. Opinion, 21-KA-733, 11/2/22.

[6] *Id*. at 236, Min. Entry, 6/1/21.

[7] *Id*. at 235, Amended Bill of Indictment, 6/1/21.

[8] *Id*. at 236-38, Trial Mins., 6/1/21; *id*. at 257-58, Trial Mins., 6/2/21; *id*. at 259-60, Trial Mins., 6/3/21; *id*. at 954-1288, Trial Tr., 6/1-3/21.

[9] *Id*. at 276, Jury Verdict Form, 6/3/21.

[10] *Id*. at 281, Sentencing Mins., 6/30/21; *id*. at 1289-92, Sentencing Tr., 6/30/21.

On direct appeal to the Louisiana Fifth Circuit, Lawrence's appointed counsel asserted one claim alleging that the state trial court erred by denying Lawrence's *Batson* challenge to one juror on panel one and two jurors on panel two of voir dire.[11]    Lawrence's pro se supplemental brief asserted two additional claims:

> (1)    The State failed to meet their burden of proof beyond a reasonable doubt in obtaining his conviction, and
> (2)    The district court erred in allowing the State to amend the bill of indictment.[12]

On November 2, 2022, the Louisiana Fifth Circuit affirmed Lawrence's conviction and sentence, finding all of the claims to be meritless, and remanded the case to the trial court to correct the minute entry to designate Lawrence's conviction is for a crime of violence and to inform him of the registration requirements for sex offenders by sending him written notice and to file proof into the record that he received such notice.[13]    On November 28, 2022,  the court also denied Lawrence's *pro se* request for rehearing.[14]    Lawrence's conviction was final 30 days later, on Wednesday, December 28, 2022, when he did not file for review in the Louisiana Supreme Court.[15]

Almost eleven months later, on November 20, 2023, Lawrence signed an application to the state trial court for post-conviction relief asserting six claims:

> (1)    trial counsel was ineffective for failure to object to the trial judge allowing the expert witness to testify as an expert;
> (2)    a conflict between him and trial counsel denied him effective assistance of counsel;

---

[11]  *Id*. at 1302, Appeal Brief, 21-KA-733, 2/23/22.

[12]  *Id*. at 1346, *Pro Se* Suppl. Appeal Brief, 21-KA-733, 5/17/22.

[13]  *Lawrence*, 362 So. 3d 816-24; ECF No. 14 at 1370-86, 1st Cir. Opinion, 21-KA-733, 11/2/22.

[14]  *Id*. at 1388, 5th Cir. Order, 21-KA-733, 11/28/22; *id*. at 1390, Application for Rehearing, 22-KA-733, 11/22/22.

[15]  La. Sup. Ct. Rule X § 5 (setting a 30-day period for seeking review in the Louisiana Supreme Court); LA. CODE CRIM. PROC. art. 922 (addressing finality of appeal judgment); *Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008) ("[A] conviction becomes final when the time for seeking further direct review in the state court expires.") (quoting *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003)).

(3)     trial counsel was ineffective for failure to request a bill of particulars;

(4)     the trial court violated his right to due process by failing to properly charge the jury on circumstantial evidence, and trial counsel was ineffective for failure to object to that error;

(5)     trial counsel was ineffective for failure to secure the attendance of a defense witness via subpoena; and

(6)     trial counsel was ineffective.[16]

On December 19, 2023, the State filed a response alleging that Lawrence's ineffective assistance of counsel claims were without merit under *Strickland v. Washington*, 466 U.S. 668 (1984), and related state law.[17]   The State also argued the claim against the trial court for improperly charging the jury on circumstantial evidence was meritless.[18]   In its reasoned order, filed on January 9, 2024, the state trial court denied relief after finding each of the claims to be meritless.[19]

On April 22, 2024, the Louisiana Fifth Circuit denied Lawrence's writ application, finding that he failed to meet his burden under *Strickland* and that the remaining claims lacked merit.[20] The Louisiana Supreme Court denied Lawrence's related writ application without stated reasons on September 4, 2024.[21]

## III.    <u>FEDERAL HABEAS PETITION</u>

Lawrence filed a petition for federal habeas corpus relief on November 21, 2024, asserting the following claims:

(1)     trial counsel was ineffective for failure to object to the trial judge allowing the expert witness to testify as an expert;

---

[16] ECF No. 14-1 at 403, 409, Application for Post-Conviction Relief, 11/20/23.

[17] *Id*. at 501-516, State's Response, 12/19/23.

[18] *Id*. at 508-10.

[19] *Id*. at 582-84, Trial Court Order Denying Post-Conviction Relief, 1/9/24.

[20] *Id*. at 603-06, 5th Cir. Order, 24-KH-83, 4/22/24.

[21] *Id*. at 610, La. Sup. Ct. Order, 2024-KH-00666, 9/4/24.

(2)     a conflict between him and trial counsel denied him effective assistance of
         counsel;

(3)     trial counsel was ineffective for failure to request a bill of particulars;

(4)     the trial court violated his right to due process by failing to properly charge
         the jury on circumstantial evidence, and trial counsel was ineffective for
         failure to object to that error;

(5)     trial counsel was ineffective for failure to secure the attendance of a defense
         witness via subpoena;

(6)     trial counsel rendered ineffective assistance of counsel;

(7)     the trial court erred in denying his Batson challenge of one juror on panel
         one and two jurors on panel two during voir dire;

(8)     the verdict was contrary to the law and evidence; and

(9)     the trial court erred in denying his application for post-conviction relief on
         the merits.[22]

On April 24, 2025, the State filed a response in opposition to Lawrence's petition asserting
that the petition was not timely filed.[23] Lawrence did not file a reply to the State's opposition
although he was provided an opportunity to do so.

## IV.    LAW AND ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-
132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28
U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996,[24] and applies to habeas petitions
filed after that date.[25]  For purposes of applying the AEDPA, Lawrence's federal petition is
deemed filed on November 21, 2024.[26]

---

[22] ECF No. 4-6 at 7.

[23] ECF No. 15 at 13-21.

[24] The AEDPA was signed into law on that date and did not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 (5th Cir. 1992).

[25] *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).

[26] The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting *pro se*.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998) (mailbox rule applies to determine if AEDPA applies even if filing fee is paid later); *Cooper v.*

### A.    Preliminary Considerations

The two threshold questions in habeas review under AEDPA are (1) whether the petition is timely and (2) whether petitioner's claims were adjudicated on the merits in state court.   In other words, has the petitioner exhausted state court remedies and is the petitioner in "procedural default" on a claim.[27]   The State asserts that Lawrence's federal habeas petition was not timely filed under the AEDPA.   For the reasons that follow, the State's limitations defense is supported by the record and provides grounds for dismissal of Lawrence's petition.

### B.    AEDPA Statute of Limitations

Section 2244(d)(1) of the AEDPA establishes a one-year statute of limitations for the filing of a federal habeas petition.   Under § 2254(d)(1)(A), a petition must ordinarily be filed within one year of the date the conviction became final under federal law.[28]   The one-year limitations period does not run from completion of state post-conviction review, but instead runs from the finality of

---

*Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). Lawrence's petition contains a stamp indicating it was received by the legal programs department at Louisiana State Penitentiary on November 21, 2024. It was filed electronically the same day. ECF No. 4 at 27.

[27] *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

[28] 28 U.S.C. § 2244(d)(1)(A); *Duncan v. Walker*, 533 U.S. 167, 179-80 (2001). The statute provides for four triggering events, only one of which applies here:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.   The limitation period shall run from the latest of--

A.    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B.    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;

C.    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D.    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

the petitioner's conviction.[29]   Lawrence's conviction became final on Wednesday, December 28, 2022, when he did not file for review in the Louisiana Supreme Court.[30]

Applying § 2244(d)(1)(A) literally, Lawrence had until December 28, 2023, to file his federal habeas corpus petition.   He did not file his federal habeas corpus petition within this one-year period.   Accordingly, his petition must be dismissed as untimely, unless the one-year statute of limitations was interrupted or otherwise tolled under one of the following two recognized bases for tolling.

### 1. Statutory Tolling

The AEDPA provides for suspension of its one-year limitations period: "The time during which a *properly filed application for State post-conviction or other collateral review* with respect to the pertinent judgment or claim is pending *shall not be counted* toward any period of limitation under this subsection."[31]   The Supreme Court has described this provision as a tolling statute.[32]

The plain language of this provision does not create a new, full, one-year term within which a federal habeas petition may be filed at the conclusion of state court post-conviction proceedings.[33]   Rather, as the United States Fifth Circuit and other federal courts have held, because this statute is a tolling provision, the time during which state court post-conviction proceedings are pending must merely be subtracted from the one-year limitations period:

---

[29] *Flanagan*, 154 F.3d at 199 n.1.

[30] La. Sup. Ct. Rule X § 5 (setting a 30-day period for seeking review in the Louisiana Supreme Court); LA. CODE CRIM. PROC. art. 922 (addressing finality of appeal judgment); *Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008) ("[A] conviction becomes final when the time for seeking further direct review in the state court expires.") (quoting *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003)).

[31] 28 U.S.C. § 2244(d)(2) (emphasis added).

[32] *Duncan*, 533 U.S. at 175-78.

[33] *Flanagan*, 154 F.3d at 199 n.1.

[Section] 2244(d)(2) provides that the period during which a properly filed state habeas application is pending must be excluded when calculating the one[-]year period. Under the plain language of the statute, any time that passed between the time that [petitioner's] conviction became final and the time that his state application for habeas corpus was properly filed must be counted against the one[-]year period of limitation.[34]

For a post-conviction application to be considered "properly filed" within the meaning of § 2244(d)(2), the applicant must "'conform with a state's applicable procedural filing requirements,'" such as timeliness and location of filing.[35] The timeliness consideration in Louisiana, for purposes of the AEDPA, requires application of a prison mailbox rule to state pleadings filed *pro se* by a prisoner.[36] Applying this standard to the petitioner's state court pleadings delineated in the procedural history results in a finding that this matter is not timely.

A matter is "pending" for § 2244(d)(2) purposes "as long as the ordinary state collateral review process is 'in continuance.'"[37] The phrase "other collateral review" in the statute refers to state court proceedings challenging the pertinent judgment subsequently challenged in the federal habeas petition.[38] A "pertinent judgment or claim" requires that the state court filings for which tolling is sought must have challenged the same conviction being challenged in the federal habeas

---

[34] *Id.*; *Brisbane v. Beshears*, 161 F.3d 1, 1998 WL 609926, at *1 (4th Cir. Aug. 27, 1998) (unpub.); *Gray v. Waters*, 26 F. Supp. 2d 771, 771-72 (D. Md. 1998).

[35] *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) ("When a postconviction application is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)"); *Williams v. Cain*, 217 F.3d 303, 306-307 n.4 (5th Cir. 2000) (quoting *Villegas v. Johnson*, 184 F.3d 467, 469 (5th Cir. 1999)); *Smith v. Ward*, 209 F.3d 383, 384-85 (5th Cir. 2000).

[36] *Causey v. Cain*, 450 F.3d 601, 604-05 (5th Cir. 2006).

[37] *Carey v. Saffold*, 536 U.S. 214, 219-20 (2002); *Williams*, 217 F.3d at 310 (a matter is "pending" for § 2244(d)(2) purposes until "'further appellate review [is] unavailable under [Louisiana's] procedures.'")

[38] *Dillworth v. Johnson*, 215 F.3d 497, 501 (5th Cir. 2000) (state habeas petition challenging a prior conviction in one county was other collateral review even though filed as a challenge to a second conviction in a different county); *Nara v. Frank*, No. 99-3364, 2001 WL 995164, at *5 (3d Cir. Aug. 30, 2001) (motion to withdraw a guilty plea is "other collateral review").

12

corpus petition and must have addressed the same substantive claims being raised in the federal habeas corpus petition.[39]

As calculated above, Lawrence' conviction was final under federal law on December 28, 2022. The AEDPA limitations period began to run the next day, December 29, 2022, and continued for a total of 326 days.   It was then interrupted on November 20, 2023, when Lawrence filed his state court application for post-conviction relief.   This left 39 days remaining in the one-year limitations period.   The AEDPA filing period was tolled during the pendency of Lawrence's properly filed state court post-conviction pleadings, which remained pending from its filing on November 20, 2023, through September 4, 2024, when the Louisiana Supreme Court denied Lawrence's writ application after the Louisiana Fifth Circuit issued its April 22, 2024, ruling.

The AEDPA one-year limitations period thus began to run again on September 5, 2024. The 39 remaining days expired on October 14, 2024. On that day, Lawrence had no properly filed state post-conviction or other collateral review pending in any court. The AEDPA limitations period therefore expired on October 14, 2024. Lawrence's federal petition was received by prison officials and filed on November 21, 2024, 38 days after the AEDPA limitations period expired.

### 2.  No Equitable Tolling Warranted

The United States Supreme Court has held that AEDPA's one-year statute of limitations period in § 2244(d)(1) may be equitably tolled only when the petitioner has pursued his rights diligently and rare or extraordinary circumstances exist that prevented timely filing.[40]   Those who

---

[39] *Godfrey v. Dretke*, 396 F.3d 681, 686-88 (5th Cir. 2005).

[40] *Pace*, 544 U.S. at 418; *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999); *Cantu-Tzin v. Johnson*, 162 F.3d 295, 299 (5th Cir. 1998); *Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998).

"sleep on their rights" are not entitled to equitable tolling.[41]   Thus, equitable tolling is warranted

only in situations during which a petitioner acted diligently, but otherwise was actively misled or

prevented in some extraordinary way from asserting his rights.[42]

Lawrence has asserted no reason that might constitute rare or exceptional circumstances

why the one-year statute of limitations period should be considered equitably tolled in this case,

and I can find none. Thus, the record does not establish any circumstances that might fit the

restrictive boundaries of "exceptional circumstances" described in binding precedent to warrant

equitable tolling in this case.[43]   Lawrence, therefore, is not entitled to equitable tolling of the one-

year AEDPA filing period.

## CONCLUSION

Lawrence's state court conviction was final on December 28, 2022.   He had one year from

that date to file his federal petition under the provisions of § 2244(d)(1)(A).   After considering

available statutory tolling during the pendency of his state court post-conviction proceedings, the

one-year AEDPA limitations period expired on October 14, 2024, over one month before

Lawrence filed this federal petition on November 21, 2024. Further, he has not asserted any reason

---

[41] *Fisher*, 174 F.3d at 715 (quoting *Covey v. Ark R. Co.*, 865 F.2d 660, 662 (5th Cir. 1989)).

[42] *Pace*, 544 U.S. at 418-19; *Cousin*, 310 F.3d at 848.

[43] *See Holland v. Florida*, 560 U.S. 631, 651-54 (2010) (equitable tolling warranted when attorney was grossly negligent and failed to meet professional standards of care when he ignored client's requests to timely file a federal petition and failed for years to respond to client's letters or communicate with client); *Hardy v. Quarterman*, 577 F.3d 596, 599-600 (5th Cir. 2009) (equitable tolling warranted for significant state-created delay when, for almost one year, state appeals court failed in its duty under Texas law to inform petitioner his state habeas petition was denied despite his persistent requests, and petitioner diligently pursued federal habeas relief); *United States v. Wynn*, 292 F.3d 226 (5th Cir. 2002) (tolling warranted when defendant was deceived by attorney into believing that timely motion to vacate was filed); *Coleman*, 184 F.3d at 402 ("A garden variety claim of excusable neglect does not support equitable tolling."); *Fisher*, 174 F.3d at 715 (tolling *not* justified during petitioner's 17-days in psychiatric ward where he was confined, medicated, separated from his glasses and rendered legally blind, and denied meaningful access to the courts); *Cantu-Tzin*, 162 F.3d at 300 (State's alleged failure to appoint competent habeas counsel did *not* justify tolling); *Davis*, 158 F.3d at 808 n.2 (assuming without deciding that equitable tolling was warranted when federal district court thrice extended deadline to file habeas corpus petition beyond expiration of the AEDPA grace period).

that might constitute rare or exceptional circumstances necessary to equitably toll the one-year statute of limitations period, nor has Lawrence asserted or established any other recognized exception to the expiration of the AEDPA limitations period.[44]

With no basis for tolling or any other recognized exception to the AEDPA limitation period, Lawrence's federal petition deemed filed on November 21, 2024, is *not* timely filed. It must therefore be dismissed with prejudice for that reason.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Tobe Lawrence Jr.'s habeas corpus petition under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE** as time barred.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days

---

[44] The Supreme Court has recognized that a petitioner may meet a "gateway exception" to avoid an already expired limitations period if he submits new, reliable evidence of his actual innocence with his § 2254 application. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Schlup v. Delo*, 513 U.S. 298, 314-16 (1995). "The Supreme Court has made clear that the term 'actual innocence' means factual, . . . [thus,] 'actual' innocence, as the Court stated in *McCleskey*, means that the person did not commit the crime." *Johnson v. Hargett*, 978 F.2d 855, 859-60 (5th Cir. 1992) (footnotes omitted). Petitioner has not asserted his actual innocence or presented any new, reliable evidence to meet the high burden set forth in *McQuiggin* to forgive the expiration of the AEDPA statute of limitations.

Petitioner also does not seek relief or exception from a state court imposed procedural bar for this federal court to apply the holding in *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Supreme Court held that a procedural bar imposed by state courts "'will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [state's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'" *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (quoting *Martinez*, 566 U.S. at 13). The state courts did not bar review of his post-conviction claims and instead denied each on the merits. Thus, the procedural hurdle here is not a state court imposed bar but a failure to meet the federal limitations deadline under the AEDPA. The *Martinez* and *Trevino* decisions do *not* apply to excuse the untimely filing of a federal habeas petition. *See Arthur v. Thomas*, 739 F.3d 611, 631 (11th Cir. 2014) ("Thus, we also hold that the reasoning of the *Martinez* rule does not apply to AEDPA's limitations period in § 2254 cases or any potential tolling of that period."); *Smith v. Rogers*, No. 14-0482, 2014 WL 2972884, at *1 (W.D. La. Jul. 2, 2014); *Falls v. Cain*, No. 13-5091, 2014 WL 2702380, at *3 (E.D. La. Jun. 13, 2014) (Order adopting Report and Recommendation). *Martinez* and *Trevino* also are *not* new rules of constitutional law made retroactive on collateral review to start a new one-year statute of limitations period under the AEDPA. *See In re Paredes*, 587 F. App'x 805, 813 (5th Cir. Oct. 25, 2014) ("the Supreme Court has not made either *Martinez* or *Trevino* retroactive to cases on collateral review, within the meaning of 28 U.S.C. § 2244."); *Adams v. Thaler*, 679 F.3d 312, 322 n.6 (5th Cir. 2012). Thus, neither *Martinez* nor *Trevino* provide petitioner relief from his untimely federal filing.

after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.[45]

New Orleans, Louisiana, this 19th day of August, 2025.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[45] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*) (citing 28 U.S.C. § 636(b)(1)). *Douglass* referred to the previously applicable ten-day period for filing of objections, which was extended to fourteen days by amendment effective December 1, 2009, 28 U.S.C. § 636(b)(1).